UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| JAMES LEONARD JACKSON<br>(Social Security No. XXX-XX-8198),<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>MICHAEL J. ASTRUE, COMMISSIONER<br>OF SOCIAL SECURITY,[1]<br><br>　　　　　　Defendant. | 3:05-cv-176-RLY-WGH |

## MEMORANDUM DECISION AND ORDER

### I. Statement of the Case

Plaintiff, James Leonard Jackson, seeks judicial review of the final decision of the agency, which found him not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") or Social Security Income ("SSI") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d), 1381(a); 20 C.F.R. § 404.1520(f).  The Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Plaintiff applied for DIB and SSI on February 5, 1999, alleging disability since October 16, 1998.  (R. 279-83, 72-74).  The agency denied Plaintiff's application both initially and on reconsideration.  (R. 284-90).  Plaintiff appeared and testified at a hearing before Administrative Law Judge ("ALJ") Carol Pennock on October 5, 1999.  (R. 406-29).

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue, in his official capacity only, is substituted as the Defendant in this action.

The ALJ issued an unfavorable decision on March 20, 2000. (R. 294-302). Plaintiff filed a request for review with the Appeals Council, and the Appeals Council remanded for a second hearing before. (R. 319-22). Plaintiff's second hearing took place on February 8, 2002, before ALJ Anne Thomas. (R. 430-50). Plaintiff was represented by his attorney; also testifying was a vocational expert ("VE"). (R. 430). On March 28, 2002, the ALJ issued her opinion finding that Plaintiff was not disabled because he retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 15-26). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 3-5). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on September 29, 2005, seeking judicial review of the ALJ's decision.

## II.  Medical Evidence

### A.  Back/Upper Extremity

In October 1995, several years prior to his alleged onset of disability, Plaintiff underwent surgery for disc herniation at L5-S1. (R. 136-39). By April 1996, an MRI showed improvement. (R. 181-82). Plaintiff complained of increasing back, neck, hip and leg pain in January 1998, ten months prior to his alleged onset of disability. (R. 190).

In October 1998, Plaintiff injured his arm at work. (R. 144-45). No radiological evidence of injury was found, but his doctor noted generalized tenderness, limitation of range of shoulder motion due to pain, and some impingement syndrome. (R. 144). The doctor diagnosed right elbow and shoulder strain and possible rotator cuff tear. He prescribed physical therapy (R. 144), but Plaintiff did not attend, citing cost concerns, and the doctor administered an injection (R. 143).

On November 2, 1998, Plaintiff asked for a release to return to work, stating that he would be driving a long way and could not return for a follow-up for almost two months. (R. 143). His doctor advised no pain medication or muscle relaxant while working.

In January 1999, Plaintiff complained to Harold C. Cannon, M.D., that he had chronic back pain which had bothered him a lot for the past several days. (R. 190). He also complained of neck, middle and low back pain, and bilateral hip and leg pain. Dr. Cannon thought Plaintiff had a generalized musculoskeletal pain. A lumbar MRI showed a mild bulging disc, but no canal or neural impingement. (R. 189).

In February 1999, Plaintiff said that he injured his right arm and shoulder. (R. 188). An MRI scan of the cervical spine was normal. (R. 187). An MRI of the lumbar spine showed a compression fracture for which Dr. Cannon said he "would not recommend any intervention . . . although it probably does explain his mid-back pain." (R. 187).

A March 1999 right shoulder arthrogram, and an April 1999 MRI, showed a small, full thickness rotator cuff tear of the supraspinatous tendon and moderately severe acromio-clavicular osteoarthritis. (R. 208, 214).

In May 1999, James Goris, M.D., performed arthroscopy with decompression, resection, and rotator cuff repair. (R. 215-16). In June 1999, Plaintiff still complained of pain and loss of motion in the right shoulder. (R. 217). By late July 1999, Plaintiff reported his right shoulder was improving and said that his pain was more localized around the elbow as opposed to the shoulder. (R. 220). His doctor thought he had lateral epicondylitis, and recommended continuing therapy. (R. 219-20).

In September 1999, Plaintiff complained to Romelle A. Belmonte, M.D., of muscle and

joint pain.  (R. 272).  Dr. Belmonte conducted extensive lab work, all of which was negative.  (R. 271).  Dr. Belmonte concluded that Plaintiff's problem was not infectious but perhaps rheumatological in nature.

In November 1999, rheumatologist Walter L. Norton, M.D., evaluated Plaintiff, who complained of severe headaches and upper back, shoulder and arm pain, and pain in most joints.  (R. 269-70).  Plaintiff reported that he was not taking any specific pain medication and was sleeping reasonably well.  (R. 269).  Dr. Norton found no joint swelling but noted Plaintiff "grimaced with pain on virtually any movement."  (R. 270).  Dr. Norton said most of the usual fibrocytic trigger points were not tender.  (R. 270).  Lab work was all normal; Dr. Norton thought Plaintiff had pain syndrome of uncertain etiology.  (R. 270).

In September and October 2001, Plaintiff complained to James E. Goris, M.D., of bilateral knee pain.  (R. 373).  Dr. Goris found bilateral tenderness but no swelling, full range of motion, normal stability, and minimal crepitance.  He assessed bilateral patellofemoral pain.  Plaintiff said he had popping and that his knees bothered him while walking.  Dr. Goris further found early arthritis and administered bilateral injections; he said Plaintiff's knees were stable.

In November 2001, Plaintiff underwent a consultative evaluation with Georges Dahr, M.D.  (R. 346-52).  Plaintiff complained of pain all over his body with no specific area hurting more than any other.  (R. 246).  Dr. Dahr noted Plaintiff had a normal gait and station, and full muscle strength and intact motor and sensory functions, but was unable to walk on heels and toes due to fear of falling and unable to tandem walk, hop or squat due to fear of knee pain.  (R. 347).  Straight leg raising was negative.  There was also no joint swelling or

tenderness, but Plaintiff demonstrated decreased range of motion of the lumbosacral spine and hips.  The remainder of the examination was negative, and Dr. Dahr's impression was non-specific complaints of pain all over.  He suggested Plaintiff might have depression and suggested a psychiatric referral.  However, Dr. Dahr concluded by acknowledging that Plaintiff's "[c]omplaints are not associated by objective physical findings."  (R. 347).

Dr. Dahr completed a form opining about Plaintiff's ability to do work-related activities.  (R. 349-52).  Dr. Dahr opined Plaintiff could frequently lift or carry less than ten pounds.  (R. 349).  He opined Plaintiff could stand or walk for less than two hours in an eight-hour workday.  Dr. Dahr stated that there were no objective findings to support his conclusions regarding Plaintiff's exertional limitations except for a limited range of motion in the lumbosacral spine and both hips.  (R. 350).  Dr. Dahr said Plaintiff could never balance, frequently kneel, and occasionally perform other postural activities of climbing, crouching, crawling and stooping.  (R. 350).  He opined no manipulative or environmental limitations such as reaching or working around hazards.  (R. 351-52).

**B.  Plaintiff's Seizure Disorder**

In December 1998, Plaintiff was involved in a motor vehicle accident after apparently losing consciousness while driving a semi-tractor trailer.  (R. 157-59, 165).  Right shoulder, chest and back X-rays and a head CT scan ruled out serious injury.  (R. 157-59).  A lumbar X-ray showed normal lumbar spine with minimal compression of superior plate of T12.  (R. 157).  An electroencephalogram ("EEG") was negative, showing no focal abnormalities or epileptiform activity.  (R. 148).

Neurologist Donna Lorenzo-Bueltel, M.D., evaluated Plaintiff, who reported that he

had urinary incontinence and bit his tongue during the crash. (R. 165-66). He also reported a history of smelling funny things when changing altitude rapidly, but no changes in consciousness. (R. 166). A brain MRI was negative. (R. 174). An electromyelogram ("EMG") with nerve conduction studies was consistent with mild chronic active right C5-6 radiculopathy, but gave no indication of right upper extremity mononeuropathy. (R. 164).

In January 1999, a cervical spine CT scan was normal (R. 172-73), and another EEG was negative, showing no focal abnormalities or epileptiform activity. (R. 171). Dr. Lorenzo-Bueltel reviewed Plaintiff's recent EEG and examined him. (R. 162-63). She said the EEG and lab work were normal, cranial nerves were intact, motor exam was full, and gait was normal. (R. 162). Dr. Lorenzo-Bueltel said that the history was very unclear regarding whether Plaintiff's syncopal episode was related to a seizure. She said that Plaintiff reported having been sick the day prior to the accident and was trying to hold his urination while driving; and she opined that the syncopal episode could have been secondary to vasovagal maneuvers. Dr. Lorenzo-Bueltel opined that Plaintiff's right upper extremity pain may be from his two separate injuries to the arm, and that his complaints of diffuse muscle and joint pain could be pursued with a rheumatological evaluation. (R. 162-63). A third EEG performed in May 1999 was also normal. (R. 209).

In August 1999, neurologist Roderick L. Warren, M.D., evaluated Plaintiff. (R. 223-24). Plaintiff complained of chronic pain in his neck and back since his motor vehicle accident, and Dr. Warren suggested physical therapy. Dr. Warren believed that Plaintiff's syncopal episodes were probably partial complex seizure events with secondary generalization, despite the normal EEG. (R. 224). Dr. Warren ordered an MRI and

prescribed Carbatrol (an anticonvulsant) and physical therapy. Dr. Warren advised Plaintiff to not operate a motor vehicle until he had been seizure free for a period of 90 days and to avoid operating heavy equipment.

In September 1999, a brain MRI was unremarkable. (R. 221). Between January 2000 and May 2001, Plaintiff saw Dr. Warren about every three to four months. (R. 366-72). Examinations were generally unremarkable with no major focal motor deficits. (R. 366-71).

In January 2000, Plaintiff reported having intermittent spells, with the last one occurring three to four weeks prior. (R. 371). Dr. Warren noted that Plaintiff "saw Dr. Salanova and they concurred that he is likely having partial complex seizure events." (R. 371). In April 2000, Plaintiff reported having two severe seizures in an approximately three-month period. (R. 370).

In July 2000, Plaintiff reported having one break-through seizure since April. (R. 369). Dr. Warren's exam revealed tremor in Plaintiff's hands. (R. 369). Dr. Warren also noted that Plaintiff "still has a lot of headache complaints and he is off balance. He has blurred vision from his eyes, left greater than right. I was thinking that his anticonvulsants are potentially causing part of these symptoms. Tegretol is the major culprit." (R. 369).

In October 2000, Plaintiff reported break-through seizures and left side weakness. (R. 368). Plaintiff was also noted to "have an aversion to light." (R. 368). Dr. Warren also noted Plaintiff was being treated for fibromialgia. (R. 368).

In February 2001, Plaintiff reported a bad seizure the prior December, but the doctor noted he was vague on the actual number of seizure episodes. (R. 367). Dr. Warren also noted "eye jumping" and tremor that were side effects of Plaintiff's anticonvulsant

medication. (R. 367). In May 2001, Plaintiff claimed he had persistent weekly spells, and Dr. Warren stated he was "losing track about what [he] should do next with" Plaintiff. (R. 366). Dr. Warren diagnosed a headache disorder in addition to his previous diagnosis of partial complex seizure disorder. (R. 366). Dr. Warren also continued to note Plaintiff's "severe" aversion to light as well as jumping in his eyes and double vision. (R. 366).

In November 2001, Plaintiff underwent an inpatient EEG. (R. 375-76, 385-93). At that time, Plaintiff reported having spells one to four times per week. (R. 375). The EEG showed no electrographic seizures or epileptiform abnormalitites. (R. 393).

**C. Plaintiff's Mental Condition**

In November 1999, Plaintiff underwent a consultative evaluation with psychologist Joel S. Dill, Ph.D. (R. 240-44). Dr. Dill administered intelligence, personality and mental status testing and interviewed Plaintiff. (R. 240-49). Plaintiff said he was tired all of the time and awakened every two hours because of pain. (R. 241). He went to physical therapy three times per week, walked one block to the store, helped with the laundry, and went grocery shopping. (R. 243). Plaintiff's memory was adequate, and he was able to perform simple math problems and serial seven calculations without difficulty. (R. 241-42). Attention span and concentration were adequate, and Plaintiff was able to comprehend procedural instructions with little repetition necessary. (R. 240). The personality inventory results suggested depressive symptoms, and somatoform processes from which Plaintiff's pain could have stemmed. (R. 243).

Dr. Dill diagnosed pain disorder associated with both psychological factors and a general medical condition and an adjustment disorder, and he rated Plaintiff's Global

Assessment of Functioning ("GAF") as 60, which is indicative of moderate symptoms or difficulty in functioning. (R. 243-44). Dr. Dill opined Plaintiff had a good ability to handle complex, detailed or simple job instructions; follow work rules; use judgment; and maintain personal appearance. (R. 248-499). He opined Plaintiff was seriously limited in his ability to relate to co-workers, interact with supervisors, deal with work stresses, function independently, maintain attention and concentration, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. He also opined that Plaintiff had poor or no ability to deal with the public. (R. 248).

In October 2001, Plaintiff underwent a consultative evaluation with neuropsychologist Jeffrey W. Gray, Ph.D. (R. 340-45). Dr. Gray noted Plaintiff had a slightly flat and depressed affect, but was oriented and able to comprehend procedural instructions with little repetition necessary. (R. 340). Simple calculations, serial sevens, recitation testing, and coding tasks indicated Plaintiff had fairly normal attentional abilities. (R. 341). Dr. Gray opined Plaintiff was able to perform simple, repetitive tasks as well as some detailed tasks that were only one to three steps in nature and did not require stringent speed or quota components or frequent shifts. (R. 342-43). Dr. Gray's impression was a pain disorder associated with both psychological factors and a general medical condition, and adjustment disorder with depressed mood, with a GAF of 60. (R. 343). Dr. Gray stated that Plaintiff would have a mild degree of difficulty consistently relating to co-workers and interacting with supervisors. (R. 343). In a form ranking Plaintiff's ability to perform mental work-related activities, Dr. Gray indicated Plaintiff had moderate limitation in his ability to handle detailed instructions, and a slight limitation in his ability to handle short, simple instructions, and to make

judgments on simple work-related decisions. (R. 344). Dr. Gray then opined Plaintiff had a marked limitation in the ability to interact appropriately with the public; a moderate limitation in his ability to interact appropriately with supervisors and co-workers, and to respond appropriately to work pressures in a usual work setting; and a slight limitation in his ability to respond to changes in a work routine setting. (R. 345).

**D. State Agency Review**

On March 23, 1999, state agency physician D. DuBois, M.D., reviewed the record and concluded that Plaintiff's condition did not meet or equal a listed impairment and, in fact, that he did not have a severe impairment. (R. 36, 131-32). Dr. DuBois noted Plaintiff's syncope attack was not felt to be a seizure, EEG was normal, and there were no significant neuromuscular abnormalities. (R. 131). The doctor noted mild cervical radiculopathy, but Plaintiff had full motor strength except for the right deltoid, and normal sensory examination and gait.

In May 1999, state agency physician L. Bastnagel, M.D., reviewed the record and concluded that Plaintiff's condition did not meet or equal a listed impairment, and that Plaintiff was able to perform a range of medium work with limitations to frequent postural maneuvers to accommodate his right shoulder injury. (R. 34, 123-30). Dr. Bastnagel noted breakaway weakness. (R. 125).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this Court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the Court must still affirm the ALJ's decision denying benefits.  *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

### IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five step test the ALJ is to employ in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 416.920.  The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an

impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy. *Id.* The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ, Anne Thomas, concluded that Plaintiff was insured for DIB through the date of her decision, and Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 24). The ALJ continued by finding that, in accordance with 20 C.F.R. § 416.920(b), Plaintiff had five impairments that are classified as severe:  status post microdisectomy at L5-S1, mild C5-6 radiculopathy, degenerative disc disease, syncopal episodes, and an adjustment disorder with depressed mood. (R. 21). The ALJ concluded that none of these impairments met or were substantially similar to any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 25). Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of his limitations were not fully credible. (R. 25). Consequently, the ALJ concluded that Plaintiff retained the RFC for light unskilled work (work consisting of one to three-step tasks in a stable setting without stringent speed or production requirements) with no interaction with the public and occasional interaction with co-workers or supervisors; only occasional postural activities with occasional reaching overhead with his right arm; no lifting or working overhead; and no operating of commercial vehicles or exposure to hazardous conditions. (R. 25). The ALJ determined that, because of these limitations, Plaintiff could not perform his past work. (R. 25). The ALJ went on to

conclude that, based on his limitations, Plaintiff retained the RFC to perform a limited range of light work existing in substantial numbers in the regional economy. (R. 25). The ALJ concluded by finding that Plaintiff was not under a disability. (R. 25).

## VI. Issues

The Court concludes that Plaintiff has essentially raised four issues. The issues are as follows:

1. Should the ALJ have considered Listings 11.02 and 11.03?

2. Did the ALJ fail to make an adequate credibility determination?

3. Did the ALJ fail to consider evidence of somatoform processes and their effect on Plaintiff?

4. Was the ALJ's RFC assessment supported by substantial evidence?

**Issue 1: Should the ALJ have considered Listings 11.02 and 11.03?**

Plaintiff's first allegation is that the ALJ erred when she failed to find that Plaintiff met any of the Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. Specifically, Plaintiff finds fault in the ALJ's failure to examine Listings 11.02 and 11.03 for epilepsy. However, it is clear that neither of these listings were met. Both listings require seizures occurring in great frequency; for Listing 11.02 the seizures must occur once a month despite three months of treatment, and for Listing 11.03 the seizures must occur weekly. As Dr. Warren's notes indicate, Plaintiff was reporting seizures in 2000 and 2001 that were no more frequent than once every two or three months.[2] (R. 366-73). Plaintiff's seizures, regardless of their

---

[2]The Court does note one form filled out by Dr. Oliver from January 3, 2001, that indicates "blackouts" three to four times a week. However, this note does not address whether

-13-

etiology, simply were not of a frequent enough duration to meet these listings. Therefore, the ALJ did not err on this matter and her decision at step three must be affirmed.

**Issue 2: Did the ALJ fail to make an adequate credibility determination?**

Plaintiff next argues that the ALJ did not engage in an adequate determination of Plaintiff's credibility. The ALJ's credibility assessment, found at R. 22-23, was as follows:

> The claimant testified he has a seizure disorder and that he had an accident when he blacked out while driving. He reported he has back problems with pain running down into his legs and feet and up into his shoulders and arms. He also reported he has tremors and arm cramps. The claimant also testified he has vision problems, that his eyes are sensitive to the light, and he has migraines three to four times a week although he has not received consistent treatment for this. He reported that he spends about half the day lying down and that he has seizures a couple of times a week. He also reported he does some cooking but cannot do any laundry.
>
> In terms of his functional capabilities, the claimant testified he could stand for 20 to 30 minutes at a time and sit for 20 to 30 minutes at a time. He also reported he could lift less than 10 pounds.
>
> I do not find the claimant's testimony concerning his pain and limitations to be entirely credible. With the exception of the assessment made by Dr. Dahr (that was not based upon objective findings) no physician or other health care provider indicated the claimant was anywhere near as limited as the claimant indicates he is. However, allowing that the claimant's C5-6 radiculopathy and degenerative disc disease would cause the claimant some limitations exertionally, I find that the claimant has the residual functional capacity for light work. In addition, since the claimant has a shoulder injury, I find he can only occasionally reach overhead with his right upper extremity but cannot lift or perform work overhead. In addition, giving some credibility to the claimant's complaints of knee pain, I find that he can perform postural activities occasionally. Although the claimant's syncope episodes have not been truly diagnosed[,] since the claimant continues to report that activity and his physicians have not disregarded it, I find that the claimant should not operate commercial vehicles and should avoid all exposure to hazards. In addition, in

---

these were seizure episodes and it contradicts the evidence from Dr. Warren who was treating Plaintiff during the same time period. The ALJ was permitted to determine which of these reports was the most credible. It was not error for her to select Dr. Warren's notes as more credible.

> light of Dr. Gray's assessment of the claimant's mental status, I find he is
> limited to unskilled work including detailed work of one to three steps in a
> stable work setting without a stringent speed or production requirement where
> interaction with the public is not required and there is only occasional
> interaction with supervisors and co-workers.

(R. 22-23). This was not an adequate credibility determination.

The Seventh Circuit has noted that an ALJ's credibility determination will not be overturned unless it is "patently wrong." *Powers v. Apfel,* 207 F. 3d 431, 435 (7th Cir. 2000). However, whether the decision is wrong depends upon how closely the ALJ follows SSR 96-7p, the regulation promulgated by the Commissioner to assess and report credibility issues. SSR 96-7p states that there is a two-step process that the ALJ engages in when determining an individual's credibility:

> First, the adjudicator must consider whether there is an underlying
> medically determinable physical or mental impairment(s) – i.e., an
> impairment(s) that can be shown by medically acceptable clinical and laboratory
> diagnostic techniques –  that could reasonably be expected to produce the
> individual's pain or other symptoms.  The finding that an individual's
> impairment(s) could reasonably be expected to produce the individual's pain or
> other symptoms does not involve a determination as to the intensity, persistence,
> or functionally limiting effects of the individual's symptoms.  If there is no
> medically determinable physical or mental impairment(s), or if there is a
> medically determinable physical or mental impairment(s) but the impairment(s)
> could not reasonably be expected to produce the individual's pain or other
> symptoms, the symptoms cannot be found to affect the individual's ability to do
> basic work activities.
>
> Second, once an underlying physical or mental impairment(s) that could
> reasonably be expected to produce the individual's pain or other symptoms has
> been shown, the adjudicator must evaluate the intensity, persistence, and
> limiting effects of the individual's symptoms to determine the extent to which
> the symptoms limit the individual's ability to do basic work activities.  For this
> purpose, whenever the individual's statements about the intensity, persistence,
> or functionally limiting effects of pain or other symptoms are not substantiated
> by objective medical evidence, *the adjudicator must make a finding on the
> credibility of the individual's statements based on a consideration of the entire
> case record.  This includes the medical signs and laboratory findings, the*

> *individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.* This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

Social Security Ruling 96-7p (emphasis added; footnote omitted). SSR 96-7p further provides that the ALJ's decision regarding the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id*. Moreover, 20 C.F.R. § 404.1529(c)(3) states that when a claimant's subjective individual symptoms, such as pain, are considered, several factors are relevant including: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

   In this instance there appear to be two underlying symptoms that could lead to

Plaintiff's complaints of debilitating pain and other symptoms: a somatoform disorder that was clearly diagnosed by Dr. Dill, and Plaintiff's seizure disorder diagnosed by Dr. Warren. Because there are impairments that could reasonably lead to Plaintiff's pain and other symptoms, the ALJ was required to undertake a determination of Plaintiff's credibility. Specifically, the ALJ was to examine the factors listed in 20 C.F.R. § 404.1529(c)(3). The Court notes that one of these factors was the type, dosage, effectiveness and side effects of any medication that Plaintiff was taking. In this case, the medical record clearly reveals that Plaintiff began taking an anticonvulsant drug to treat his partial complex seizure disorder in August of 1999. (R. 366-72). Dr. Warren noted that some of the side effects for these drugs could include aversion to light, blurred vision, eyes jumping, headaches and tremors. (R. 367, 369). Dr. Warren's examination of Plaintiff appears to have noted some of these side effects including tremors, sensitivity to light, and eyes jumping, and Plaintiff complained to Dr. Warren about the remaining side effects being present. Additionally, at his administrative hearing in 2002, as the ALJ noted, Plaintiff continued to complain of some of these symptoms including the tremors, vision problems and headaches. (R. 22-23). In light of the fact that Dr. Warren opined that these were legitimate side effects for an anticonvulsant drug, the ALJ was bound to address them in accordance with SSR 96-7p and 20 C.F.R. § 404.1529(c)(3). The credibility assessment here did not specifically address other factors mentioned in the regulation – for example factors 1, 2 and 3 – to allow a reviewer to understand which portions of the record the ALJ was relying on to deal with the effect these syncopal episodes were having on Plaintiff and why his subjective descriptions were not credible. Her failure to do so makes her credibility determination inconsistent with some requirements of the regulation.

The Court is unable to trace the path of the ALJ's reasoning, and this case must be remanded for a new credibility determination that takes into consideration all of the relevant factors on how Plaintiff's seizures affect his ability to work.

**Issue 3: Did the ALJ fail to consider evidence of somatoform processes and their effect on Plaintiff?**

Plaintiff was diagnosed with a somatoform disorder by Dr. Dill. (R. 243). And, Dr. Gray's consultative examination came to a similar conclusion that Plaintiff was suffering from a pain disorder that included a psychological component. (R. 343). Hence, in evaluating Plaintiff's credibility with regard to his complaints of pain, the ALJ, on remand, should take into consideration the psychological component of Plaintiff's pain as well as the physical component.

**Issue 4: Was the ALJ's RFC assessment supported by substantial evidence?**

Because the ALJ failed to make an adequate determination of Plaintiff's credibility in accordance with SSR 96-7p and 20 C.F.R. § 404.1529(c)(3), the Court need not examine her assessment of Plaintiff's RFC. Unless the ALJ finds that Plaintiff's complaints of vision problems, headaches and tremors are not fully credible, these limitations will need to be factored into Plaintiff's new RFC.

## VII.  Conclusion

The ALJ's credibility determination did not address in all respects the requirements of SSR 96-7p.  The ALJ's decision is, therefore, **REMANDED.**  On remand, the ALJ shall take into account the factors listed in 20 C.F.R. § 404.1529(c)(3), especially Plaintiff's anticonvulsant medication and its side effects.

**SO ORDERED** the 28th day of March, 2007.

                                                              RICHARD L. YOUNG, JUDGE
                                                              United States District Court
                                                               Southern District of Indiana

Electronic copies to:

Eric Joseph Yocum
eric_yocum@msn.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov